IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| IN THE MATTER OF: ) | |
| ) | CASE NO. BK15-82016 |
| CHARLES DONALD LEONARD and ) | A16-8002 |
| MARGARET ROSE LEONARD, ) | |
| ) | CHAPTER 11 |
| Debtor(s). ) | |
| SWEETWATER CATTLE COMPANY, ) | |
| L.L.C., and FARM CREDIT SERVICES ) | |
| OF AMERICA, PCA, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| vs. ) | |
| ) | |
| LEIGH MURPHY d/b/a ) | |
| MURPHY CATTLE COMPANY, ) | |
| ) | |
| Defendant. ) | |

ORDER

      This matter is before the court on the parties' cross-motions for summary judgment. David W. Pederson represents Sweetwater Cattle Company, Jim R. Titus represents Farm Credit Services of America, and David J. Skalka represents Leigh Murphy and Murphy Cattle Company. Evidence and briefs were filed and, pursuant to the court's authority under Nebraska Rule of Bankruptcy Procedure 7056-1, the motions were taken under advisement without oral arguments.

      Sweetwater's motion is granted. Murphy's motion is denied.

      This is a dispute over the validity and priority of interests in cattle. In brief, the debtor arranged to purchase feeder cattle from Murphy and have them delivered to Sweetwater for care and feeding. Sweetwater agreed to finance the debtor's purchase of the cattle through Farm Credit Services. The cattle were delivered to Sweetwater's feedlot and the debtor issued checks to Murphy and other sellers as payment for the cattle. Several of the checks were not honored and Murphy received only partial payment for the cattle. The debtor filed the underlying Chapter 11 bankruptcy case, and Murphy, Sweetwater, and Farm Credit now are fighting over who holds superior lien rights to the livestock proceeds. As between Murphy and the debtor, the court previously granted summary judgment to Murphy, finding that Murphy had successfully reclaimed the cattle under the U.C.C. in a state-court replevin hearing, and those reclamation rights were unaffected by the Bankruptcy

Code.[1] *See* Order of Apr. 8, 2016 (Fil. No. 42 in Adv. Proceeding No. A15-8044). Therefore, the present dispute involves only non-debtor parties, but the parties requested to have it decided in the bankruptcy court rather than in state court because the outcome of the case will determine the amount of the losing party's unsecured claim in the bankruptcy case, which gives the bankruptcy court subject-matter jurisdiction under the "related to" provision of 28 U.S.C. § 1334. The test for whether a civil proceeding is related to a case under title 11 is whether the outcome of the proceeding could conceivably have any effect on the bankruptcy estate. *Dogpatch Prop., Inc. v. Dogpatch U.S.A., Inc. (In re Dogpatch, U.S.A., Inc.)*, 810 F.2d 782, 786 (8th Cir. 1987). In other words, if the outcome of the civil proceeding could alter the debtor's rights, liabilities, options, or freedom of action and in any way impacts upon the handling and administration of the bankruptcy estate, the action is related. *Id.*; *Specialty Mills, Inc. v. Citizens State Bank*, 51 F.3d 770, 774 (8th Cir. 1995).

The parties all consented to entry of final judgment by the bankruptcy court.

## I. Summary Judgment Standard

Summary judgment requires an analysis of the case's facts and a determination as to whether or not any genuine factual issues exist. Entry of summary judgment is appropriate only if the record, when viewed in the light most favorable to the non-moving party, shows there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c) (made applicable to adversary proceedings in bankruptcy by Fed. R. Bankr. P. 7056); *see, e.g.*, *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Id.* (quoting *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

## II. Background

The following facts are either agreed to by the parties or undisputed:

1. Sweetwater Cattle Company, L.L.C., is a Nebraska limited liability company with its headquarters in Buffalo County, Nebraska.

2. Charles Leonard, one of the debtors in this case, is an individual residing in Sarpy County, Nebraska, doing business as Leonard Cattle Company.

---

[1] The state court granted immediate possession of the cattle to Murphy, but the parties stipulated that the animals would remain at Sweetwater's lot until they were sold, with Sweetwater to be paid from the proceeds for their feed and care, and rights to the remaining proceeds to be determined later. The state court specifically declined to decide issues of title, ownership, and lien priority among Murphy, Sweetwater, and Farm Credit, as those matters were beyond the scope of the replevin complaint.

3. Leigh Murphy is an individual doing business as Murphy Cattle Company in Colorado and New Mexico.

4. For more than 20 years, Leonard has been in the business of buying and selling cattle as a bonded commission dealer as well as for his own account.

5. Leonard has had prior dealings with Sweetwater, and at the time the bankruptcy case was filed, other cattle owned by Leonard were in the Sweetwater lot.

6. Leonard and Murphy executed a written contract on July 10, 2015, for Leonard to purchase up to 400 head of cattle from Murphy, with delivery to be taken by loading trucks in Fraser, Colorado, between September 20, 2015, and October 5, 2015.

7. Leonard paid Murphy a $10,000 down payment when the contract was entered into. The balance of $802,910 was to be paid at delivery.

8. Leonard purchased the cattle from Murphy with five checks, four of which were later dishonored.

9. Leonard's dealings with Sweetwater were through Mike Twitchell, who is the managing member of Sweetwater.

10. Sweetwater's business model involved providing secured financing to its customers who needed it. Sweetwater made these loans from a line of credit it has with Farm Credit Services.

11. In broad terms, the arrangement between Leonard and Sweetwater was that Leonard would transfer the cattle to Sweetwater, Sweetwater would finance Leonard's purchase and the feed and care of the cattle, with a deduction in the nature of a down payment. Thereafter, Sweetwater would continue to feed and care for the cattle, and ultimately market and sell those cattle. At the time of sale, the proceeds would be used first to repay Sweetwater for the amount financed, including feed and care, with the balance going to Leonard.

12. The deal between Leonard and Sweetwater was made on or about September 23, 2015, at which time the cattle were transferred from Murphy's facility in Colorado to Sweetwater's lot north of Kearney, Nebraska.

13. Sweetwater loaned Leonard $598,402.16 to finance the purchase of the cattle.

14. The cattle had been in the Sweetwater lot for a little less than a month when Twitchell was contacted by Murphy, who inquired whether the cattle were located at the Sweetwater lot. Twitchell confirmed they were, and he became aware at that point that there was a dispute between Leonard and Murphy arising from the dishonor of Leonard's checks to Murphy.

15. Prior to that call from Murphy, no representative of Sweetwater had any knowledge of the Murphy-Leonard transaction other than the fact that with the cattle came a bill of sale showing that Murphy had sold the cattle to Leonard.

16. Murphy filed a replevin action in Buffalo County District Court seeking to recover the cattle, and an order in replevin was entered by that court finding Murphy was entitled to reclaim the cattle for which he had not received payment.

17. The cattle were eventually sold and the gross proceeds totaled $883,073.25. Of that amount, Sweetwater has been paid $215,119.87 for feeding and caring for the animals. The balance is held in escrow pending the outcome of this litigation.

### III. The Parties' Positions

Sweetwater's argument is straight-forward. It argues that because Murphy surrendered possession of the cattle to the debtor, Murphy lost the ability under the Uniform Commercial Code to reserve title or a security interest in the animals. Sweetwater, as a secured creditor and good-faith purchaser, believes it has superior rights to the proceeds.

Murphy, on the other hand, makes three arguments for why it should prevail in this matter: (1) as a matter of law, title to the steers never transferred to the debtor; (2) alternatively, Sweetwater is not a good-faith purchaser for value because it cannot as a matter of law demonstrate exercise of reasonable commercial standards in the feedlot trade; and/or (3) reasonable commercial standards in the trade required Sweetwater to review and determine it had a valid bill of sale showing ownership by the debtor, which it did not do. Murphy believes Sweetwater's security interest never attached to the steers.

#### A. Background Concerning the Transactions Among Sweetwater, Leonard, and Farm Credit.

Sweetwater custom feeds cattle for third-party owners in addition to its own cattle, and it also has a line of credit from Farm Credit for advances with which to finance the purchase of and feed for cattle brought in by others. This has been described as a common practice in the feedlot industry. Sweetwater and Leonard had done business for several years prior to the events at issue here, and Sweetwater financed Leonard's earlier purchases of cattle placed at the feedlot. In fact, Leonard started out with a $500,000 line of credit from Sweetwater, but as he sent more and more cattle to Sweetwater to be fed, the credit was increased to $2.5 million in August 2015. In taking on finance customers, Sweetwater, at Farm Credit's request, makes sure it has filed a U.C.C. financing statement on the collateral, performs a U.C.C. search in the customer's state of residence to find other liens, and sends out subordination agreements to other lienholders, if any.

The affidavit and deposition testimony of Sweetwater's managing member describes the arrangement between Leonard and Sweetwater concerning the steers at issue. Leonard contacted

Sweetwater about placing the cattle in Sweetwater's feedlot. Sweetwater agreed to accept them on the following conditions:

    1. The steers would be trucked from Colorado to the feedlot at Leonard's expense.

    2. The steers would arrive free and clear of all liens and encumbrances.

    3. In addition to feeding and caring for the animals, Sweetwater would finance the purchase of the steers under the following terms:
        a. Total value would be determined based on $1.80 per hundredweight.
        b. Sweetwater would finance the total value less approximately $300 per head which would be considered an equity payment from Leonard.
        c. Sweetwater would wire the financed amount to Leonard.
        d. The terms of the arrangement between Leonard and Sweetwater would be governed by the promissory notes signed by Leonard.

    4. After this conversation with Leonard, Sweetwater checked the records of the Nebraska Secretary of State and the Nebraska Brand Committee, as well as records in Colorado, to confirm that the cattle were free and clear of liens and encumbrances.

    5. None of these records showed any interest held by Murphy.

    6. After the cattle arrived and before any funds were transferred to Leonard, Sweetwater received and reviewed the bill of sale and Colorado brand report verifying that Murphy had sold these steers to Leonard.

    7. When the cattle arrived at Sweetwater's facility on September 23, 2015, the amounts of the financing arrangment were confirmed:
        a. The steers were valued at $737,676.[2]
        b. The equity down payment was calculated to be $139,273,84.
        c. The balance financed by Sweetwater was $598,402.16.

    8. The promissory notes and security agreements executed by the parties were assigned to Farm Credit, which wired the funds directly to Leonard.

B. <u>Sweetwater's U.C.C. Argument</u>.

---

[2]Leonard admitted to Twitchell that he had purchased the steers at a high price, overpaying for them.

Sweetwater claims it has a superior interest in the cattle proceeds because Murphy shipped the cattle to Nebraska without taking any steps to reserve title or a security interest until he had received payment. In doing so, Sweetwater argues, he transferred title to Leonard, who then transferred title to Sweetwater as a good-faith purchaser.

Sweetwater relies on the provisions of §§ 2-401 and -403 of the Uniform Commercial Code. Section 2-401 section states:

> § 2-401. Passing of title; reservation for security; limited application of this section
>
> Each provision of this article with regard to the rights, obligations, and remedies of the seller, the buyer, purchasers, or other third parties applies irrespective of title to the goods except where the provision refers to such title. Insofar as situations are not covered by the other provisions of this article and matters concerning title become material the following rules apply:
>
> (1) Title to goods cannot pass under a contract for sale prior to their identification to the contract (section 2-501), and unless otherwise explicitly agreed the buyer acquires by their identification a special property as limited by the Uniform Commercial Code. Any retention or reservation by the seller of the title (property) in goods shipped or delivered to the buyer is limited in effect to a reservation of a security interest. Subject to these provisions and to the provisions of the Article on Secured Transactions (Article 9), title to goods passes from the seller to the buyer in any manner and on any conditions explicitly agreed on by the parties.
>
> (2) Unless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller completes performance with reference to the physical delivery of the goods, despite any reservation of a security interest and even though a document of title is to be delivered at a different time or place; and in particular and despite any reservation of a security interest by the bill of lading
>
> (a) if the contract requires or authorizes the seller to send the goods to the buyer but does not require him or her to deliver them at destination, title passes to the buyer at the time and place of shipment;
>
> . . .
>
> (4) A rejection or other refusal by the buyer to receive or retain the goods, whether or not justified, or a justified revocation of acceptance revests title to the goods in the seller. Such revesting occurs by operation of law and is not a "sale".

Neb. Rev. Stat. Ann. U.C.C. § 2-401.

The relevant provision of § 2-403 then provides that Leonard had the power to transfer good title to Sweetwater:

> § 2-403. Power to transfer; good faith purchase of goods; entrusting

>     (1) A purchaser of goods acquires all title which his or her transferor had or had power to transfer except that a purchaser of a limited interest acquires rights only to the extent of the interest purchased. A person with voidable title has power to transfer a good title to a good faith purchaser for value. When goods have been delivered under a transaction of purchase the purchaser has such power even though
>         (a) the transferor was deceived as to the identity of the purchaser, or
>         (b) the delivery was in exchange for a check which is later dishonored, or
>         (c) it was agreed that the transaction was to be a "cash sale", or
>         (d) the delivery was procured through fraud punishable as larcenous under the criminal law.

Neb. Rev. Stat. Ann. U.C.C. § 2-403.

The contract terms called for delivery of the cattle to Leonard at Fraser, Colorado. The facts indicate that no one representing Leonard was able to be in Fraser when the cattle were loaded onto trucks on September 23, 2015, so Murphy was present for the loading and delivery to Leonard for transport to Sweetwater's feedlot. The truckers were sent with the government-mandated documentation for transporting the cattle, including the bill of sale and brand and health inspections. On the same date, Leonard directed an employee to issue checks for the cattle, and those checks were sent the following day.

Long-standing Nebraska case law supports Sweetwater's position. In *Jordan v. Butler*, 156 N.W.2d 778 (Neb. 1968), the Nebraska Supreme Court ruled that a third-party lender's security interest in 200 head of cattle took priority over the interest of the unpaid seller. The seller delivered the cattle to the buyer's brother, as instructed. The brother promptly pledged the cattle as collateral for a loan, based on a bill of sale between the brothers. In the meantime, sight drafts drawn by the seller were not honored, so the seller remained unpaid. The brother later sold some of the cattle without the knowledge or permission of the lender, leaving both the seller and the lender owed money. On appeal, the court ruled that the seller lost his ownership of the cattle under U.C.C. § 2-401 because title passed to the buyer upon delivery. Non-payment of the purchase price did not revest title in the seller. The transaction between the brothers was found to be fraudulent, such that the title transferred by the buyer was voidable. However, the lender had no knowledge of the fraud, and qualified as a good-faith purchaser for value. The court ruled that the lender's lien was entitled to be paid first from the available proceeds, with the seller to receive the balance, if any. In so holding, the court noted:

> It must be pointed out that it is a rule of long standing that where one of two innocent persons must suffer by the acts of a third, the one whose conduct, act, or omission enables such third person to occasion the loss must sustain it if the other party acted in good faith without knowledge of the facts and altered his position to his detriment. *Terry Bros. & Meves v. National Auto Ins. Co.*, 160 Neb. 110, 69 N.W.2d 361. It was Jordan who delivered the cattle without collecting the purchase price that made it

> possible for Jack and Duane Butler to perpetrate the fraud on the Securities Company as a good faith purchaser for value without notice.

*Jordan v. Butler*, 156 N.W.2d 778, 785 (Neb. 1968).

The Nebraska Supreme Court has also addressed the issue – and reached the same conclusion – more recently, in *Maryott v. Oconto Cattle Co.*, 607 N.W.2d 820 (Neb. 2000). Here, the seller delivered cattle to the buyer, as he had done for years. The buyer generally was slow to pay, but until this transaction, the seller had always been paid within three weeks after delivery. When the seller presented the drafts issued for this transaction for payment, they were not honored because the buyer's lender cancelled his line of credit. The lender claimed a security interest in the cattle based on cross-collateralization and after-acquired property clauses in loan documents. In a replevin action for the return of the cattle, the seller argued that it was an industry standard that title to cattle did not pass until the seller had been paid. The trial court ruled in the seller's favor, but on appeal, the Supreme Court reversed, specifically finding that U.C.C. § 2-401 does not provide for a revesting of title when the buyer fails to pay for the goods. The court further found that even if the seller could be said to have reserved title in the cattle, his reservation of a security interest was subject to the provisions of U.C.C. Article 9. In comparing the parties' security interests, the court found the lender's perfected security interest took priority over the seller's unperfected interest because § 2-403 permitted the buyer, even though he had not paid for the cattle, to transfer greater title rights to the lender as a good-faith purchaser than the buyer could claim, such that the Article 9 security interest could attach.

> In this case, Farm Credit's perfected security interest prevails over Maryott's unperfected interest. Article 9 does not provide an exception for an unpaid cash seller. Rather, it specifically provides a means for such a seller to perfect and achieve priority over previously perfected interests. Maryott could have protected his interest against Farm Credit's prior perfected interest by complying with the U.C.C.'s purchase-money provisions.

*Maryott v. Oconto Cattle Co.*, 607 N.W.2d 820, 828-29 (Neb. 2000).[3]

Murphy, like Maryott, could have protected himself. He was or should have been aware of the risks, but chose to trust Leonard, sending the cattle and their proof of ownership to Nebraska with nothing to show for it. This reliance on a buyer's word may be noble, but it carries no legal weight in a business transaction. Sweetwater acted in good faith, relying on the legal documents of ownership presented with the cattle. As between these two parties, Sweetwater with its security documents prevails over Murphy, who held only empty promises of payment.

---

[3]Here, the court ruled in the *Leonard v. Murphy* matter that the sale was a cash sale, even though Leonard did not mail the checks until the day after the steers arrived at Sweetwater and the checks were subsequently dishonored.

C. Murphy's Arguments.

Murphy's arguments, despite their sincerity, are unnecessarily convoluted and rely almost exclusively on tenuous factual interpretations stretched nearly to the breaking point.

1. Title Transfer.

Murphy argues that title did not transfer to Leonard because he did not obtain a valid bill of sale, so Sweetwater's security interest could not have attached. Murphy expends a great deal of effort on his argument that the bill of sale did not comply with Colorado law because it was not signed by the buyer (Leonard), and did not contain postal addresses for the seller, buyer, or witness, so it was not valid. However, contrary to Murphy's assertions, the Colorado case law cited by Murphy holds that technical compliance with the statute is unnecessary if the document was within the parties' ordinary course of dealing and within the prevailing commercial standards of fair dealing in the trade. *Cugnini v. Reynolds Cattle Co.*, 687 P.2d 962, 968 (Colo. 1984). The weight of the evidence in this case – in fact, the only evidence – demonstrates that cattlemen generally consider the bill of sale and brand inspection report as presented in this case to be valid documentation of ownership. Sweetwater submitted affidavit testimony from two Nebraska feedlot operators, in addition to Twitchell's testimony, indicating that a bill of sale such as the one at issue here, when presented with other required paperwork such as health inspection and brand inspection reports, would be considered a valid bill of sale in the industry. Despite devoting reams of paper to arguing that the bill of sale was invalid, Murphy produces no evidence to support that argument or to refute Sweetwater's evidence that it is in fact valid and sufficient to transfer title to Leonard.

2. Exercise of Reasonable Commercial Standards.

All of Murphy's arguments stem from his premise that the title transfer was not valid because the bill of sale was defective. As shown above, the bill of sale was sufficient to transfer title to Leonard, who transferred it to Sweetwater as a good-faith purchaser. Accordingly, Murphy's lengthy assertions need not be discussed in detail, beyond the comments in the following paragraphs.

Murphy argues that Leonard could not have transferred title to the cattle to Sweetwater as a good-faith purchaser because Sweetwater did not act in accordance with reasonable commercial standards of fair dealing in the trade. Nevertheless, the cases relied on by Murphy turn on facts that do not exist in the present case. *Rudiger Charolais Ranches v. Van De Graaf Ranches*, 994 F.2d 670 (9th Cir. 1993) (merchant buyer took possession of cattle without having the proper paperwork in hand); *Huffman Livestock, LP v. M5 Consulting, LLC*, Case No. 12CA0021 (Colo. Ct. App. Jan. 17, 2013) (merchant buyer lacked good faith because he failed to disclose to the original seller the extent of the initial buyer's financial difficulties and the merchant buyer's involvement in the transaction in order to be paid on a pre-existing debt from the initial buyer).

Murphy relies on Colorado case law concerning good faith and fair dealing to argue that Sweetwater did not take possession of the cattle in good faith. Murphy uses findings in the *Huffman* case – that the feedlot purchaser was not an innocent party because the feedlot and the buyer had a

separate venture for which the buyer owed the feedlot money and these cattle were to be used to pay that debt to the feedlot – to cast aspersions on Sweetwater based solely on the long-standing personal and business relationship between Leonard and Twitchell. Not one iota of evidence has been presented that Leonard's and Twitchell's friendship in any way caused this transaction to violate standards of good faith and fair dealing, or in any respect led to Murphy's loss. Murphy's arguments attempt to contort the facts and misstate the law.

### IV.  Conclusion

The bill of sale sent by Murphy with the cattle when they were delivered to Leonard and shipped to Sweetwater's feedlot was valid among the parties, giving Leonard ownership of the cattle,[4] which he then transferred to Sweetwater and Farm Credit as collateral for a loan. Sweetwater and Farm Credit, as good faith purchasers for value, hold superior rights to the proceeds of the sale of the cattle.

IT IS ORDERED: The motion for summary judgment (Fil. No. 22) filed by plaintiffs Sweetwater Cattle Company, L.L.C., and Farm Credit Services of America, PCA, is granted. The amended motion for summary judgment (Fil. No. 63) filed by defendant Leigh Murphy doing business as Murphy Cattle Company is denied. Separate judgment will be entered.

DATED: July 22, 2016.

BY THE COURT:

/s/ Thomas L. Saladino
Chief Judge

Notice given by the Court to:
    *David W. Pederson
    *Jim R. Titus
    *David J. Skalka
    U.S. Trustee

Movant (*) is responsible for giving notice to other parties if required by rule or statute.

---

[4]Subject, of course, to Murphy's reclamation rights as against Leonard.